# In the
# United States Court of Appeals
## For the Seventh Circuit

---

No. 01-1957

DONALD A. LEHN,

*Plaintiff-Appellant,*

v.

MICHAEL L. HOLMES, et al.,

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Southern District of Illinois.
No. 99 C 919—**G. Patrick Murphy**, *Chief Judge.*

---

ARGUED MAY 13, 2003—DECIDED APRIL 14, 2004

---

Before ROVNER, DIANE P. WOOD, and EVANS, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* Donald Lehn knows a lot about the ill effects of exposure to second-hand tobacco smoke. He has a Ph.D. in biochemistry and is a former Resident Research Assistant in the Laboratory of Molecular Carcinogenesis in the Division of Cancer Etiology, National Cancer Institute, which is affiliated with the National Institutes of Health, in Bethesda, Maryland. Lehn's current interest in smoke is, however, personal rather than professional. He is currently serving time in the Illinois Department of Corrections (IDOC), and he has sued

to challenge both certain IDOC practices that allegedly are denying him his right of access to the courts and IDOC policies that tolerate excessively high levels of environmental tobacco smoke (ETS) in the state's prisons. Lehn's *pro se* complaint was dismissed by the district court because the judge believed his claims were either rendered moot after Lehn was transferred to a different prison facility or were unripe for adjudication. In the alternative, the court granted the prison officials' motion to dismiss Lehn's access-to-courts claim for failure to state a claim under FED. R. CIV. P. 12(b)(6). We agree with Lehn that his access claim is ripe for judicial consideration and that both the access-to-courts and the ETS parts of his complaint state claims for which relief may be granted. Therefore, we reverse and remand this case for further proceedings.

## I

Lehn has been incarcerated in the State of Illinois since January 1996. To date, he has been housed in at least three correctional facilities: the Pontiac Correctional Center, the Big Muddy River Correctional Center, and the Graham Correctional Center. Lehn was incarcerated at Big Muddy River for four years, during which time he filed this complaint. While his complaint was pending before a magistrate judge, in August 2000, he was transferred to Graham, where he is currently incarcerated.

While Lehn was at Big Muddy River, he repeatedly asked to be assigned to a cell with a non-smoking cellmate, but his requests were denied. Lehn complained that exposure to his cellmates' tobacco smoke caused him to suffer headaches and nausea. His transfer to Graham accomplished nothing, from this standpoint. Once again, he was housed with a smoking cellmate despite his request for a non-smoker. In an affidavit, Lehn attested that during the first five and one-half months of his stay at Graham, he had a non-

smoking cellmate for only two and one-half days. Through-out this time, Lehn communicated his strenuous objection to what he perceived as an IDOC-wide policy concerning the use of tobacco products and the exposure of inmates to ETS. He complained that this exposure to second-hand smoke "threatens the plaintiff's future health and causes the plaintiff to suffer from continual [*sic*] smoking related effects—headaches and burning eyes."

Smoke was not Lehn's only problem, however. In October 1996, Lehn received copies of two Maryland arrest warrants dated October 20, 1995, and October 11, 1996. The first arrest warrant was also lodged as a detainer for Lehn's continued detention on the Maryland charges. Then, on June 30, 1997, Deputy Maryland State's Attorney Matthew Campbell issued a request for temporary custody over Lehn to Jack Hartwig, who at the time was the warden of Big Muddy River. This request was made pursuant to Article IV(A) of the Interstate Agreement on Detainers, in order to bring Lehn to trial in Maryland. (The Interstate Agreement on Detainers is an interstate compact among 48 states. It establishes standard procedures to help states resolve outstanding criminal charges against prisoners who are incarcerated in a different state. See *New York v. Hill*, 528 U.S. 110, 111 (2000); see also *United States v. Ross*, 243 F.3d 375, 375 n.2 (7th Cir. 2001).) The request for temporary custody states that Lehn "is under indictment in the County of Montgomery," Maryland. The record does not contain a response to this request for temporary custody from Warden Hartwig.

In response to the Maryland arrest warrants, Lehn filed three motions in Maryland for the appointment of counsel. The first was filed in July 1997, and the last was filed in January 2001. His efforts were unavailing: Maryland nei-ther appointed a lawyer for him nor did it even respond to any of his requests. In his final letter to the Montgomery County State's Attorney, Lehn explained that he had

learned second-hand that his case might not be prosecuted by the County. He asked for confirmation of this rumor and explained that he hoped that Maryland would withdraw the warrant against him if it was not going to prosecute him. Critically for our purposes, Lehn claimed that the outstanding warrant caused him to receive a higher security classification within Illinois's correctional system. According to Lehn, this higher security classification also kept him from getting a job in the prison industries program and affected his housing assignments.

Lehn's initial complaint contained five counts, three of which were dismissed by the district court under the mandatory screening process for prisoner lawsuits contained in 28 U.S.C. § 1915A. Lehn does not appeal the dismissal of these three counts. The two surviving counts focus on Lehn's fundamental right of access to the courts and his right to conditions of confinement that do not violate the minimum standards set by the Eighth Amendment—as applied here, his right to an environment that is not filled with dangerous levels of ETS. The defendants filed a motion to dismiss Lehn's access-to-courts count. The case was referred to a magistrate judge, who recommended that the district court deny the motion to dismiss and suggested that the court instead request additional briefing by the parties addressing whether Lehn's transfer to Graham rendered his access-to-courts and Eighth Amendment claims moot.

The district court rejected the magistrate judge's recommendations and entered an order dismissing Lehn's remaining two claims. It rejected the ETS claim first because it concluded that the claim became moot when Lehn was transferred to Graham, and in the alternative for failure to state a claim under FED. R. CIV. P. 12(b)(6). The district court also declined to exercise jurisdiction over Lehn's access-to-courts claim because the judge believed the claim was unripe. Alternatively, the court held that Lehn's complaint failed to state a claim under FED. R. CIV. P. 12(b)(6)

for violation of his right of access to the courts. With the assistance of counsel appointed by this court, Lehn appeals the dismissal of his complaint.

## II

## A

The Supreme Court has long recognized a prisoner's fundamental right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821 (1977); see also *Lewis v. Casey*, 518 U.S. 343, 350 (1996). As this court has noted in the past, "[w]ithout this right, all other rights a prisoner may possess are illusory." *Corgain v. Miller*, 708 F.2d 1241, 1247 (7th Cir. 1983). But the right of access to the courts is not an unlimited one; it assures only "meaningful access to the courts." *Bounds*, 430 U.S. at 823; see also *In re Chapman*, 328 F.3d 903, 905 (7th Cir. 2003). Moreover, the right is "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). In other words, the right of access to the courts is tied to and limited by a prisoner's right to "vindication for a separate and distinct right to seek judicial relief for some wrong." *Id.*

Lehn raises five specific complaints in connection with his general access-to-courts claim: (1) Illinois's denial of access to Maryland legal materials has hampered his ability to respond to the pending Maryland criminal charges; (2) his rights are violated by the restrictions on the amount of time he may spend in the prison library; (3) the restrictions on the quantity of photocopied legal materials he may store in his prison cell are also unlawful; (4) he has received inadequate legal assistance from the prison library staff, which resulted in the filing of a premature appeal in an unrelated case; and (5) the prison's denial of his request to purchase a laptop computer and CD-ROM materials has interfered with his ability successfully to litigate his ETS

claim. The district court dismissed the access claim in its entirety. With respect to the Maryland legal materials, the court concluded that the claim was either not ripe for judicial review, or, alternatively, that it failed to state a claim on which relief may be granted. We review this decision *de novo*. See *Metro. Milwaukee Ass'n of Commerce v. Milwaukee County*, 325 F.3d 879, 881 (7th Cir. 2003) (reviewing dismissal on ripeness grounds *de novo*); *Ortloff v. United States*, 335 F.3d 652, 655 (7th Cir. 2003) (reviewing dismissal under FED. R. CIV. P. 12(b)(6) *de novo*). In this appeal, Lehn (rightly) focuses only on his right of access to the Maryland legal materials; we similarly limit our discussion, as none of the rest of his arguments has any merit.

We should first say a word about why Illinois is the proper defendant in this case, given the fact that Lehn is seeking Maryland legal materials he needs to attack a Maryland indictment and warrants. Why is Maryland not the only proper defendant? Once the indictment was returned there, Lehn's Sixth Amendment right to counsel attached. See, *e.g.*, *Fellers v. United States*, 124 S.Ct. 1019, 1022 (2004). It was and remains Maryland's responsibility to ensure that this right is respected. Yet Lehn asked Illinois to provide those legal materials. We must consider, therefore, how (if at all) Illinois has become implicated in the Maryland proceedings.

In most cases where prisoners seek out-of-state materials, they are trying to attack, either directly or collaterally, a conviction from that state. The proper defendant in those cases is the state in which the prisoner was convicted. See, *e.g.*, *Boyd v. Wood*, 52 F.3d 820 (9th Cir. 1995); *Clayton v. Tansy*, 26 F.3d 980 (10th Cir. 1993); *Demps v. Florida*, 696 So. 2d 1296 (Fla. Dist. Ct. App. 1997); *Salstrom v. Arizona*, 714 P.2d 875 (Ariz. Ct. App. 1986). If the two states are parties to the Interstate Corrections Compact (ICC), the state housing the inmate might also be a proper defendant

in an access-to-courts claim because it is acting as an agent of the sending state. See 730 ILCS 5/3-4-4 (Interstate Corrections Compact, art. IV(a)); MD Code § 8-605 (same). The ICC allows receiving and sending states to allocate burdens between themselves for the care of inmates and affords a prisoner convicted out-of-state with the same rights as a prisoner convicted in-state. Lehn, however, is serving a sentence for an Illinois conviction only; he has not yet been convicted of any crime in Maryland, and so he is not yet subject to the ICC.

More importantly, Lehn's case is different because his focus is on the way that *Illinois* is using the mere fact of a Maryland indictment (not, we stress, a conviction after full court proceedings) in a way adverse to his interests. *Cf. Petrick v. Maynard*, 11 F.3d 991, 995 (10th Cir. 1993) (inmate sought out-of-state legal materials in order to challenge out-of-state convictions that were relied on to enhance the sentence that the prisoner received in the state in which he was incarcerated). We have no quarrel with the proposition that if Lehn were seeking to attack the Maryland proceedings for his own purposes, and faced no potential harm from those outstanding indictments in Illinois, then he would be required to pursue his claim against the responsible Maryland authorities. But, to reiterate, that is not the gist of his complaint. He asserts, for example, that Illinois is presently using the fact of the Maryland indictment to increase his security classification while he is incarcerated in Illinois. Maryland is apparently doing nothing with the case. Illinois cannot take advantage of Maryland's desuetude to impose legal burdens on Lehn, without giving Lehn an opportunity to challenge the basis for Illinois's action. This means that Illinois faces a choice: it may either refrain from taking Lehn's legal status in Maryland into account in his security classification, qualifications for prison jobs, and other concrete ways, or it may rely on the Maryland accusations. If it takes the former

course, it is under no obligation to furnish Maryland legal materials to Lehn; if it takes the latter course, it must give Lehn the tools with which to challenge the Maryland indictment. Lehn has alleged that IDOC is presently using the Maryland indictment adversely to him. Because the case was dismissed under Rule 12(b)(6), we must accept that allegation. If, of course, the state contests that fact, the matter can be explored before the district court. But for now, the Illinois defendants are proper parties in this case.

We turn next to the district court's conclusion that Lehn's access claim is not ripe for judicial review. Ripeness doctrine is based on the "central perception . . . that courts should not render decisions absent a genuine need to resolve a real dispute." 13A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 3532.1, at 114 (2d ed. 1984). Like the related doctrine of mootness, ripeness is grounded in both Article III and prudential concerns. *Daniels v. Area Plan Comm'n of Allen County*, 306 F.3d 445, 452 n.3 (7th Cir. 2002); *Hinrichs v. Whitburn*, 975 F.2d 1329, 1333 (7th Cir. 1992). "Cases are unripe when the parties point only to hypothetical, speculative, or illusory disputes as opposed to actual, concrete conflicts." *Hinrichs*, 975 F.2d at 1333.

The Supreme Court has announced two factors that determine whether an issue is ripe for judicial consideration. First, the issue on which review is sought must be fit for judicial decision. *Texas v. United States*, 523 U.S. 296, 300-01 (1998) (quoting *Abbott Labs.*, 387 U.S. at 149); see also *Hinrichs*, 975 F.2d at 1333. Second, courts must take into account any "'hardship to the parties of withholding court consideration.'" *Texas*, 523 U.S. at 301 (quoting *Abbott Labs.*, 387 U.S. at 149); see also *Hinrichs*, 975 F.2d at 1333.

The district court dismissed Lehn's access claim after finding it unripe for judicial review primarily because the court did not believe that Maryland was actively prosecut-

ing its case against Lehn. The court assumed, in light of the apparent dormant nature of the Maryland case, that Lehn would not suffer any hardship if the court refused to exercise jurisdiction over his access claim. It came to this conclusion despite the fact that the record before it showed that Lehn was indicted in Maryland while he was in custody in Illinois and that in 1997 Maryland sought Lehn's temporary transfer pursuant to the Interstate Agreement on Detainers, in order to bring him to trial in Maryland.

We cannot agree that the apparent lack of action in the Maryland proceeding renders Lehn's claim unripe for judicial review. As far as we can tell, there is still a pending indictment against Lehn in Maryland. Although Lehn has not been prosecuted under this indictment, we have no indication that it was dismissed. At oral argument, we asked about the status of the Maryland proceedings. Counsel for Lehn reiterated that his client never received a response to his requests for appointed counsel. The Assistant Attorney General for the State of Illinois took the position that because nothing has happened in the Maryland proceedings since 1997, Maryland is not going forward with its case against Lehn. The Assistant Attorney General further asserted that she had information not contained in the record that the Maryland prosecutor's records indicated that Lehn was never served with a warrant in this case. But, apart from the fact that we cannot stray outside the record, this is beside the point: Lehn was indicted on various charges in the state of Maryland. This indictment has never been dismissed, and unless or until it is, Lehn's claim is ripe for judicial review. As we noted earlier, the hardship that Lehn is suffering without access to Maryland legal materials is that he has no effective way to challenge the outstanding indictment against him.

This brings us to the merits of Lehn's access claim, which the district court dismissed with prejudice in the alternative under FED. R. CIV. P. 12(b)(6). As we have already

noted, the law requires only " '[m]eaningful access' to the courts." *Bounds*, 430 U.S. at 823. It does not require any specific resources such as a law library or a laptop with a CD-ROM drive or a particular type of assistance. *Lewis*, 518 U.S. at 351. Instead, a prisoner must show that a prison's policy actually hampered her pursuit of a legal claim. *Id.*; see also *Bounds*, 430 U.S. at 823; *Ortloff*, 335 F.3d at 656. To this end, we have established a two-part test for access-to-court claims. "First, the prisoner must prove that prison officials failed to assist in the preparation and filing of meaningful legal papers. . . . Second, he must show some quantum of detriment caused by the challenged conduct of state officials." *Brooks v. Buscher*, 62 F.3d 176, 179 (7th Cir. 1995) (internal quotation marks and citations omitted).

In order to avoid dismissal under Rule 12(b)(6), Lehn therefore had to allege that he had a non-frivolous legal claim that was frustrated or impeded by IDOC's failure to assist him in the preparation and filing of meaningful legal papers and that he was harmed by IDOC's action (or lack thereof). As usual, we ask whether his allegations would entitle him to relief based on the establishment of any conceivable set of facts in support of his claim. *Sanville v. McCaughtry*, 266 F.3d 724, 732 (7th Cir. 2001). The district court dismissed Lehn's complaint finding that the very fact that two of the five counts in his complaint survived § 1915A screening meant that Lehn was not impeded in his ability to pursue his legal claims by IDOC's policies. Finding that Lehn had not suffered any harm, the district court believed that his access claim failed to meet the concrete injury test and dismissed it with prejudice.

This takes too narrow a view of Lehn's claims. First, the district court was focusing on Lehn's ability to litigate in the Illinois action, while Lehn was addressing his ability to defend himself in Maryland's courts. It also conflates two different questions: whether a complaint can survive the

initial screening required by the Prison Litigation Reform Act of 1996 (PLRA), 28 U.S.C. § 1915A(b)(1), and whether a prisoner has access to sufficient legal resources to enable her to participate meaningfully in her lawsuit. The district court thought that because Lehn had stated a non-frivolous, non-malicious claim concerning his access to courts, it followed that his right of access to the courts was not impeded. The implication of the court's conclusion for prisoners is that all access-to-courts claims that survive § 1915A screening will necessarily fail to state a claim for abridgement of that right. This plainly goes too far. After all, a judge may recognize a meritorious claim that is presented only in skeletal form, or that (as here) relates to access to different courts, or access with respect to a different proceeding in the same courts. The claim itself will need to be fleshed out and properly developed, even though it survived the § 1915A screening process.

Although we disagree with the district court's analysis of Lehn's access claim, there is an additional hurdle that Lehn faces before he can go forward with his complaint. Neither the parties nor the district court specifically addressed whether Lehn's desire to challenge his Maryland arrest warrant or indictment is the type of legal action that the fundamental right of access to the courts protects. In *Lewis*, the Supreme Court made clear that the right of access to the courts is limited to certain types of litigation. As the Court explained,

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of

> the incidental (and perfectly constitutional) conse-
> quences of conviction and incarceration.

518 U.S. at 355. Lehn, who has not been tried, convicted or sentenced in Maryland, is obviously not in a position to bring a direct or collateral attack on what is not yet even a conviction. But it is logical to conclude that a prisoner has just as much of an interest in a criminal indictment, which necessarily precedes a criminal conviction, as she does in the actual sentence or conviction that may result from that indictment. As long as Lehn is suffering present conse-quences in the "conditions of his confinement" from the pendency of the Maryland proceedings, he should not have to wait to see if Maryland actually intends to bring him to trial (if it is not too late to do so). He is entitled to challenge the indictment against him right now. *Cf.*, *Johnson by Johnson v. Brelje*, 701 F.2d 1201, 1207 (7th Cir. 1983) (recognizing right of access to courts for pretrial detainees), abrogated on other grounds by *Maust v. Headley*, 959 F.2d 644, 648 (7th Cir. 1992).

The next question is whether IDOC's policies have denied him access to the basic materials that he needs in order to move his challenge forward. It is clear that they have. IDOC's refusal to provide Lehn with access of any kind to Maryland legal materials is equivalent to a type of injury that the Supreme Court suggested is actionable in *Lewis*. In that case, the Court intimated that a prisoner would state a valid claim if "he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint." 518 U.S. at 351. *Lewis* makes clear that the deficiencies in the prison library—the complete lack of Maryland legal materials— have deprived Lehn of the opportunity to mount a state law attack against the indictment, which is affecting his conditions of confine-ment. Lehn's situation is the defense-side equivalent to the more common one in which a prison's library is so inade-

quate that it deprives a prisoner of the opportunity to file a complaint. The fact that Lehn seeks out-of-state legal materials is irrelevant. The inquiry must be whether a particular prisoner is being denied access to those materials (from the relevant jurisdiction) that are necessary to launch an initial attack. See, *e.g.*, *Caldwell v. Miller*, 790 F.2d 589, 606-07 (7th Cir. 1986); *Corgain*, 708 F.2d at 1250. Since we find that Lehn possesses a right of access to the courts with regard to his Maryland indictment, IDOC must either clearly renounce any reliance on that proceeding or find some way to provide Lehn with access to the essential legal materials he needs.

This leaves two remaining points. On remand the district court will need to look into the status of the proceedings against Lehn in Maryland. If in fact Maryland has dismissed the outstanding indictment and withdrawn the warrant for Lehn's arrest, then there is no longer a need for Lehn to access Maryland legal materials, and the court should dismiss his claim as moot. If, however, Lehn is still under indictment in Montgomery County, then his claim is not moot and IDOC can decide how it wishes to proceed, consistently with this opinion.

## B

We turn now to Lehn's ETS claim. The district court decided that this part of the case became moot when Lehn was transferred from Big Muddy River to Graham. In addition to deciding the question of mootness, we independently asked the parties to brief whether Lehn has standing to challenge IDOC's "practice of housing nonsmoking inmates in the same cell with smoking inmates."

The Supreme Court has observed that the doctrines of standing and mootness address different aspects of a federal court's jurisdiction to hear a case. As Justice Ginsburg explained in *Friends of the Earth, Inc. v. Laidlaw Environ-*

*mental Services, Inc.*, 528 U.S. 167 (2000), standing ensures that federal courts devote their time and attention "to those disputes in which the parties have a concrete stake," whereas mootness often comes into play after a case has been litigated for a number of years, but no longer concerns a live dispute. *Id.* at 191-92.

Like the doctrine of ripeness, standing is grounded in both Article III and prudential concerns. See 13 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 3531, at 345 (2d ed. 1984); see also *Friends of the Earth*, 528 U.S. at 178-79. The threshold inquiry from a constitutional perspective is whether the case presents an actual case or controversy for the court to resolve. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). Yet even when that condition is met, for prudential reasons a court may decline to exercise jurisdiction "if as a matter of judicial self-restraint it seems wise not to entertain the case." 13 WRIGHT, MILLER & COOPER, FEDERAL PRACTICE & PROCEDURE, § 3531, at 345 (2d ed. 1984).

We see no reason to refuse to exercise jurisdiction over Lehn's ETS claim as a matter of judicial restraint; therefore we need only assure ourselves that Article III's standing requirements are met. To establish Article III standing, Lehn must show:

> (1) [he] has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth*, 528 U.S. at 180-81. Lehn's complaint alleges a concrete, particularized, actual injury that is directly traceable to IDOC's system-wide practice of housing

non-smoking inmates with smokers. His injury would be redressable by a decision forcing IDOC to change its practice. At this juncture in the proceedings, questions of proof are premature: Lehn's complaint states that IDOC's practice threatens his future health and causes him presently to suffer from headaches and burning eyes. This is the type of injury that the Supreme Court found cognizable in *Helling v. McKinney*, 509 U.S. 25, 35 (1993) (recognizing the possibility of an Eighth Amendment claim based on future serious health problems because of a prison smoking policy). Lehn does not have to allege anything further in order to satisfy Article III's standing requirements.

Implied in this analysis is an interpretation of Count 4 of Lehn's complaint. When he filed his *pro se* complaint, Lehn was an inmate at Big Muddy River and had been there for nearly three years. Nevertheless, he drafted his complaint to state a claim against IDOC for its smoking policies; he did not limit himself to an allegation that the practice of housing non-smoking inmates with smokers was unique to Big Muddy River. Furthermore, Lehn named both Michael Holmes, the Big Muddy River warden, and Donald Snyder, the director of IDOC, as defendants. This too suggests that Lehn, as master of his own complaint, sought relief from a system-wide policy. Finally, after the magistrate judge recommended that the district court seek additional briefing from the parties on the mootness question, Lehn filed objections with the district court that focused directly on the question of mootness, asserting that his complaint named defendants Donald Snyder and Michael Holmes in their official capacities, seeking permission to substitute the current Graham warden for Holmes, and reiterating that he was challenging what he alleged were system-wide policies promulgated by IDOC. In his objections to the magistrate judge's recommendations, Lehn also alleged that he continued to suffer from exposure to ETS at Graham.

The district court disposed of his ETS claims on the basis of mootness by construing the complaint as seeking injunctive and declaratory relief only with regard to Big Muddy River, thereby ignoring Lehn's efforts to challenge the policy at the statewide level. For this reason the court believed Lehn's claim was "necessarily rendered moot by Plaintiff's transfer to a different institution." Defendants, in urging that we affirm the district court, believe that the decision in *Higgason v. Farley*, 83 F.3d 807 (7th Cir. 1995) (*per curiam*), helps them. But that case stands only for the uncontroversial proposition that when a prisoner who seeks injunctive relief for a condition specific to a particular prison is transferred out of that prison, the need for relief, and hence the prisoner's claim, become moot. *Id.* at 811. *Higgason* did not confront the issue raised in Lehn's case: whether a prisoner who seeks relief from a condition that stems from a system-wide policy, who is then transferred to a different facility within the same system where the objectionable policy also applies, states a claim. Neither *Higgason* nor any of the cases following it address this point. See, *e.g.*, *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003) (finding transfer from prison where inmate sought declaratory and injunctive relief concerning strip search practice mooted claim); *Henderson v. Sheahan*, 196 F.3d 839, 848 n.3 (7th Cir. 2000) (finding transfer from Cook County Jail to state prison system mooted plaintiff's claim for declaratory and injunctive relief against jail-specific practice).

We express no opinion on the question whether Lehn will be able to present enough evidence at the summary judgment stage to take his ETS claim to a trier of fact. Compare *Oliver v. Deen*, 77 F.3d 156 (7th Cir. 1996). At the 12(b)(6) stage, however, Lehn has attacked IDOC's practices as a whole, and he has argued that he was adversely affected by those practices as implemented at both Big Muddy River and Graham. A § 1983 plaintiff states a valid claim when

she alleges two things: (1) deprivation of a federal right (2) by a party acting under color of state law. *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001). The Supreme Court in *Helling* upheld a prisoner's Eighth Amendment claim that alleged that prison officials had exposed her against her will to unreasonably high levels of ambient smoke, which posed a serious risk to her future health. 509 U.S. at 35; see also *Alvarado*, 267 F.3d at 651 (recognizing valid Eighth Amendment ETS claim based on current and future serious health risk).

To state a claim under the Eighth Amendment on the basis of future injuries (which is what we understand Lehn has done at least in part in his complaint), he must allege facts that "satisfy the objective and subjective elements necessary to prove an Eighth Amendment violation." *Henderson*, 196 F.3d at 847. The objective component requires Lehn to allege "that he himself is being exposed to unreasonably high levels of ETS," *id.* (quoting *Helling*, 509 U.S. at 35), and the subjective component requires Lehn to allege "that prison officials were deliberately indifferent to his plight as a non-smoker placed in a smoking environment." *Id.* (quoting *Helling*, 509 U.S. at 36). Guided by the rule that *pro se* complaints are construed liberally, see *Calhoun*, 319 F.3d at 943, we find that Lehn has met these standards. One of the documents that he attached to his complaint, which we view as incorporated into the complaint, see FED. R. CIV. P. 10(c), is a letter to Warden Hartwig indicating Lehn's intent to file a lawsuit asserting his Eighth Amendment right to "a living environment that is free of environmental tobacco smoke." This letter documents Lehn's view that he was being exposed to intolerable levels of ETS, as well as his unsuccessful efforts to have Big Muddy River officials rectify his living situation. At this stage, he need do no more.

## III

For these reasons, the judgment of the district court is REVERSED, and this case is REMANDED for further proceedings consistent with this opinion.

EVANS, *Circuit Judge*, concurring in part, dissenting in part. I agree with the majority that Lehn's ETS claim should not have been dismissed under Rule 12(b)(6). However, the majority's conclusion on Lehn's access-to-the-courts claim is, I respectfully submit, erroneous. That claim should remain dismissed for several reasons, the most important being that on the state of this record, Illinois is not obligated to assist Lehn in defending himself against the Maryland "charges" (whatever form they take and assuming they actually exist).

It's a little hard to put my finger on exactly what the majority is saying regarding Illinois' responsibility vis-à-vis the Maryland "indictment" (or, as variously described, either the Maryland arrest warrants or Maryland's request under the Interstate Agreement on Detainers), but as best I can make out, it is that the Maryland proceedings somehow affect Lehn's security classification in Illinois, and that keeps him from getting a good prison job and/or better "housing assignments." Perhaps there's more here that I don't see, but if this is the case, I don't see how it becomes a constitutional denial of access-to-the-courts claim.

The majority tells us, citing *Fellers v. United States*, 124 S.Ct. 1019 (2004), that once the Maryland indictment was returned, "Lehn's Sixth Amendment right to counsel at-

tached," and that it is "Maryland's responsibility to ensure that this right is respected" (page 6). That's not quite accurate. Lehn's right to counsel on the Maryland indictment will ripen when he makes an initial appearance in a Maryland courtroom to answer charges against him. *See Brewer v. Williams*, 430 U.S. 387 (1977) (The Sixth Amendment right to counsel is triggered "at or after the time that judicial proceedings have been initiated . . . 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment,'" (quoting *Kirby v. Illinois*, 406 U.S. 682, 689)). It is the commencement of "judicial proceedings" that gives birth to Sixth Amendment rights. To say that the mere issuance of an indictment starts the ball rolling is rather odd. Think how many people are not in custody when charges (either complaint, indictment, or information) are issued. Is a state required to appoint a lawyer (assuming indigency) for someone who has not yet been physically presented in court to answer charges? I think not.

While it is true that Lehn would have a right to counsel (and Fifth Amendment rights as well) if Maryland law enforcement officers wanted to question him after he was indicted but before judicial proceedings actually started (the situation in *Fellers*), that's not what is going on here. So the fact that an "indictment" might be out there someplace doesn't trigger any constitutional "rights" Lehn might have at this time to start working on a defense.

Everything I've just said about an indictment is equally true if what we are talking about here are "Maryland arrest warrants." And that leaves possible proceedings under the Interstate Agreement on Detainer (IAD). The IAD provides procedures for inmates and prosecutors to follow when looking to resolve outstanding criminal charges pending in a noncustodial state. The purpose of the IAD is "to encourage the expeditious and orderly disposition" of untried charges pending in states other than where the defendant

is presently incarcerated. (IAD, Article 1.) The IAD recognizes that an inmate, subject to a detainer, may not be eligible for certain rehabilitative programs. One underlying purpose of the IAD is, therefore, a reduction in the number of limitations on prisoner participation in rehabilitative programs. Another purpose is the speedy, if requested by an inmate, disposition of criminal charges.

The scheme encompassed in the IAD is really quite simple. The first procedural prerequisite is the filing of a detainer against an inmate. A detainer is just a document that puts the officials of the institution where the inmate is incarcerated on notice that the inmate is wanted on charges in another state. *See United States v. Mauro*, 436 U.S. 357 (1978). Because the detainer is merely a notice, it does not authorize the transfer of the inmate.

Article III of the IAD describes the process an inmate must use to initiate his own transfer. The inmate must notify the prosecuting authority and the court where the charges are pending that he requests the disposition of those charges. The request must be accompanied by a certificate from the official who has custody of the inmate. The certificate describes the length of commitment, time already served, and the time remaining to be served in the state that has the inmate in custody.

Once the prosecutor and the trial court receive the inmate's request and time certificate, the inmate must be tried within 180 days unless that period is extended for good cause. Article III of the IAD also provides that the request for the disposition of the charges constitutes a waiver of any extradition rights that may be available to the inmate.

Article IV of the IAD describes the procedures associated with the transfer of an inmate at the request of the state where charges are pending. After the detainer is filed, the prosecutor must file a request for temporary custody of the

inmate. That request is made to the authority where the inmate is incarcerated. That request must be approved by the court that has jurisdiction over the charges.

When detainers are filed, both an inmate and the state where unresolved charges are pending, have choices. The inmate can ignore the detainer (many in fact do—the lapse of time may make the second state reluctant to prosecute a stale case) or request that he be brought up for trial. If the request is made, the state with pending charges has two options: bring the inmate to court where formal proceedings will be commenced or drop the detainer. The latter option is often pursued if the time and effort to produce and prosecute an inmate will accomplish little or nothing. For example, if Oregon, holding a burglary indictment, files a detainer against an Indiana inmate serving 25 years for second degree murder, chances are slim that it would want to incur the expense of bringing him to Portland where, if ultimately found guilty, he might only receive a short concurrent sentence.

In our case it is not at all clear that there actually *is* an IAD document filed against Lehn or, if there is, that he has done what he must do to trigger an obligation on Maryland's part to either drop it or bring him to the east coast for trial. And Lehn certainly doesn't need "Maryland legal materials" to do this. The problem with the majority's decision is that we are telling Illinois that it must now have legal materials available or accessible in its prison library from 47 states. For these reasons, I dissent on the access-to-courts issue.

A true Copy:

    Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*